IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

FXFWY01, INC.; FXFWY03, INC.; FXFWY04, INC.; SCHULTISE ENTERPRISES, INC.; JP GANCZAK ENTERPRISES; FXKOK01, INC.; FXKOK02, INC.; CENTRAL ACQUISITION, INC.; MRK DELIVERIES, INC.; TZ INTERNATIONAL, INC.; TIM JOLLOFF, Individually, and LISA JOLLOFF, Individually,

    Plaintiffs,

v.                                                          Case No.:

FEDERAL EXPRESS GROUND PACKAGE SYSTEM INC.,

    Defendant.

_____/

**COMPLAINT**

COME NOW, FXFWY01, INC.; FXFWY03, INC.; FXFWY04, INC.; SCHULTISE ENTERPRISES, INC.; JP GANCZAK ENTERPRISES; FXKOK01, INC.; FXKOK02, INC.; CENTRAL ACQUISITION, INC.; MRK DELIVERIES, INC.; TZ INTERNATIONAL, INC. ("the Plaintiff Corporations"), TIM JOLLOFF, Individually, and LISA JOLLOFF, Individually (jointly, "JOLLOFF") (all of the above jointly, "Plaintiffs"), by and through the undersigned counsel, and sue Defendant, FEDERAL EXPRESS GROUND PACKAGE SYSTEM INC. ("FEDEX"), and allege as follows:

**STATEMENT OF JURISDICTION**

1.    The District Court has subject matter jurisdiction because: (1) complete diversity exists, and (2) the amount in controversy, exclusive of interest and costs, exceeds the jurisdictional minimum of $75,000.00 pursuant to 28 U.S.C §1332(a).

1

2. Complete diversity of citizenship exists because at the time of filing of the action, Plaintiffs are citizens of Indiana and Florida, while FEDEX at all times relevant was a citizen of both Delaware where it is incorporated, and/or Pennsylvania where its principal place of business is located.

## PARTIES

3. At all times relevant, Plaintiff FXFWY01, INC. ("FXFWY01"), was a citizen of the State of Indiana. It was incorporated and duly authorized to do business in the State of Indiana, with its principal place of business there as well.

4. At all times relevant, Plaintiff FXFWY03, INC. ("FXFWY03"), was a citizen of the State of Indiana. It was incorporated and duly authorized to do business in the State of Indiana, with its principal place of business there as well.

5. At all times relevant, Plaintiff FXFWY04, Inc. ("FXFWY04") was a citizen of the State of Indiana. It was incorporated and duly authorized to do business in the State of Indiana, with its principal place of business there as well.

6. At all times relevant, Plaintiff SCHULTISE ENTERPRISES, INC. ("SCHULTISE ENTERPRISES"), was a citizen of the State of Indiana. It was incorporated and duly authorized to do business in the State of Indiana, with its principal place of business there as well.

7. At all times relevant, Plaintiff JP GANCZAK ENTERPRISES was a citizen of the State of Indiana. It was incorporated and duly authorized to do business in the State of Indiana, with its principal place of business there as well.

8. At all times relevant, Plaintiff FXKOK01, INC. ("FXKOK01"), was a citizen of the State of Indiana. It was incorporated and duly authorized to do business in the State of Indiana, with its principal place of business there as well.

9. At all times relevant, Plaintiff FXKOK02, INC. ("FXKOK02"), was a citizen of the State of Indiana. It was incorporated and duly authorized to do business in the State of Indiana, with its principal place of business there as well.

10. At all times relevant, Plaintiff CENTRAL ACQUISITION, INC. ("CENTRAL ACQUISITION "), was a citizen of the State of Indiana. It was incorporated and duly authorized to do business in the State of Indiana, with its principal place of business there as well.

11. At all times relevant, MRK DELIVERIES, INC. ("MRK DELIVERIES "), was a citizen of the State of Indiana. It was incorporated and duly authorized to do business in the State of Indiana, with its principal place of business there as well.

12. At all times relevant, TZ INTERNATIONAL, INC. ("TZ INTERNATIONAL "), was a citizen of the State of Florida. It was incorporated and duly authorized to do business in the State of Florida, with its principal place of business there as well.

13. TIM JOLLOFF, was an individual with citizenship in Indiana for a relevant portion of time. He then established citizenship in Florida for the remaining relevant time.

14. LISA JOLLOFF, was an individual with citizenship in Indiana for a relevant portion of time. He then established citizenship in Florida for the remaining relevant time.

15. Defendant, FEDEX GROUND PACKAGE SYSTEM, INC. ("FEDEX"), is a citizen of Delaware where it is incorporated, and/or Pennsylvania, where its principal place of business is located.

## FACTUAL BACKGROUND

**Indiana**

16. In or around 2012, JOLLOFF began their relationship with FEDEX when they purchased FXFWY01, to provide package delivery services for FEDEX in Fort Wayne, Indiana, as an independent provider.

17. FXFWY01 was responsible for delivering packages to specific geographic areas referred to by the Parties as Contracted Service Areas ("CSA").

18. Over the course of the following six years, JOLLOFF acquired or was the main stockholder in approximate nine corporations—the Plaintiffs in this action—and his business grew and was successful. At all times, JOLLOFF was the authorized representative of all Plaintiff corporations, and was the designated point of contact with FEDEX (as required by FEDEX).

19. Each entity had contracts with FEDEX to deliver packages in specific CSAs and JOLLOFF spent millions of thousands of dollars to acquire those CSAs. (*Note--Plaintiffs do not have copies of said contracts, as FEDEX requires that CSAs remain in its possession, custody, and control*).

20. In Fort Wayne, Indiana, JOLLOFF had an interest in FXFWY01, FXFWY03, FXFWY04, SCHULTISE ENTERPRISES, INC., and JP GANCZAK ENTERPRISES ("Fort Wayne Corporations"), all delivering packages for FEDEX.

21. In 2014, JOLLOFF added the Kokomo, Indiana, location with the following corporations delivering packages for FEDEX: FXKOK01, FXKOK02, CENTRAL ACQUISITION, and MRK DELIVERIES ("Kokomo Corporations").

22. Between the Fort Wayne and Kokomo locations, Plaintiff had over one hundred delivery trucks. The Fort Myers location, described below, had 18 delivery trucks.

4

23. All interests in Plaintiff corporation were acquired by JOLLOFF with FEDEX's express approval.

24. This is FEDEX's business model and contractual requirement; although an independent corporation services a specific CSA, it cannot sell that CSA without FEDEX's express approval.

25. From the inception of JOLLOFF's relationship with FEDEX in 2012, and continuing through mid-2018, JOLLOFF's businesses were thriving, meeting all the benchmarks, and JOLLOFF continued to expand.

26. Later, in or around August of 2019, JOLLOFF acquired TZ INTERNATIONAL, INC., to service CSAs in Fort Myers, Florida but by this point, FEDEX had already determined it would push JOLLOFF out of the business altogether.

**The Beginning of the End in Fort Wayne**

27. In or around May 2018, FEDEX presented new contract terms for the Fort Wayne Corporations. These new contracts were referred to as the Independent Service Provider Agreements ("ISP"). (*Note—Plaintiffs do not have copies of the contracts, which are in FEDEX's possession, custody, and control, per FEDEX requirement, as with the aforementioned CSAs.*)

28. The new ISP changed the pricing for the Fort Wayne Corporations so that the corporations were making considerably less revenues for the very same work that had been performing for the preceding six years.

29. The Fort Wayne Corporations were completing the same or more stops and engaging in the same behavior that they had been yet realizing less revenue.

30. JOLLOFF immediately notified FEDEX about the revenue shortfall. Specifically, they informed FEDEX that the Fort Wayne Corporations were having trouble covering their operating expenses.

31. FEDEX requested to see all the financials from the Fort Wayne Corporations, which JOLLOFF turned over. After review, FEDEX reassured JOLLOFF that all was fine, even though the Fort Wayne corporations were unable to pay their basic bills.

32. Due to the revenue shortfall, the Fort Wayne Corporations were unable to cover payroll, fuel, insurance, truck repairs, and other basic operating costs.

33. As such, JOLLOFF reached out to FEDEX once more in an attempt to renegotiate the terms of the ISP.

34. In or around August 2018, FEDEX requested that JOLLOFF to travel to Toledo, Ohio to discuss the financial issues presented by the new ISP.

35. JOLLOFF met with Mark Williams, one of FEDEX's five nations Vice Presidents, and Carlos Etheredge, FEDEX's regional Vice President, to request a revision of the ISP.

36. However, after weeks of discussions, FEDEX refused JOLLOFF's request.

37. Shortly thereafter, Mr. Etheredge went to Fort Wayne and met with JOLLOFF and his Fort Wayne managers.

38. Mr. Etheredge presented a letter to JOLLOFF regarding all of the Fort Wayne Corporations, which stated that the only way FEDEX would allow a renegotiation of the ISP Agreements would be if JOLLOFF agreed to sell three of the five corporations within the next year.

39. Within the letter, FEDEX threatened that if Plaintiff were unable to sell three of the five corporations, FEDEX would take the routes for the three corporations without compensation.

40. Mr. Etheredge personally guaranteed that the renegotiation would increase Plaintiff's revenue substantially but would not agree to put that in writing.

41. In reality, the new contract weighed heavily against the interests of the Fort Wayne Corporations and, therefore, JOLLOFF did not agree to the new terms.

42. However, as a show of good faith, JOLLOFF listed all five Fort Wayne Corporations for sale with a business broker.

43. In the meantime, despite best efforts, the Fort Wayne Corporations continued to face economic hardship throughout the summer and fall of 2018.

**Holiday Peak Season 2018 (Fort Wayne)**

44. In preparation of the anticipated holiday peak season, JOLLOFF used a large amount of savings to acquire rental units early and to hire additional drivers to support the five entities located in Fort Wayne, Indiana.

45. JOLLOFF—having successfully navigated holiday peak season for five years in a row—anticipated that the Fort Wayne Corporations would need about fifty additional seasonal drivers.

46. FEDEX disagreed and stated that only twenty-six additional drivers were necessary.

47. It is important to note that before a new driver could become an employee of any independent service provider, FEDEX required the potential employee to be vetted through a third-party company. Furthermore, FEDEX was completely in control of this process, not JOLLOFF, or the Fort Wayne Corporations.

48. FEDEX monitored and managed the prospective employee's progress in the system which included, but was not limited to, drug testing, background checks, and review of driving records.

49. This process normally took three to four days for other similarly situated FEDEX independent service providers but for the Fort Wayne Corporations the process was taking two to three *weeks*.

50. FEDEX interfered and intentionally delayed the processing of the prospective drivers to ensure the failure of the Fort Wayne Corporations during holiday peak season. And FEDEX succeeded.

51. During the first few days of the 2018 holiday peak season, JOLLOFF noticed that packages were going undelivered due to the driver shortage.

52. As a direct and proximate result of FEDEX's interference and intentional acts, the Fort Wayne Corporations failed to meet the necessary benchmarks of the ISP and suffered extreme economic loss during what was anticipated to be their busiest and most lucrative time of the year.

53. On December 26, 2018, FEDEX issued each of the Fort Wayne Corporations an Opportunity to Cure ("OTC") in the form of a letter.

54. This was the first step to officially terminating the Fort Wayne Corporations' routes and was what FEDEX planned all along when it contrived to ensure their failure during peak season.

55. According to the ISPs, when an OTC is issued, the independent service provider loses its exclusive right to renew the routes, thereby allowing other independent service providers to bid on the routes.

56. In response to FEDEX's OTC notices, the Fort Wayne Corporations provided written assurances on or about January 5, 2019. But their fates had been sealed long before peak season even started.

**FEDEX Interference with the Staff of the Fort Wayne Corporations**

57. In or around November 2018, FEDEX, through its employee Dan Jordan, then Assistant Manager for FEDEX at the Fort Wayne location, approached Plaintiff's managers, Chad Yates, Eric Bucher, James Bowers, Ryan Wolfe, Jesse Gould, and Jason Whitney – on numerous occasions and encouraged them to quit.

58. Mr. Jordan told the employees that the Fort Wayne Corporations were failing and encouraged them to find other employment.

59. On or about December 10, 2018, Chad Yates—who worked was the Head Manager for all the Fort Wayne and Kokomo Corporations for years—quit one week into peak season as a direct result of FEDEX's constant demands, pressure, and interferences.

60. Mr. Jordan also approached the Fort Wayne Corporations' drivers and encouraged them to quit or seek employment with the other independent service providers.

61. Mr. Jordan allowed trucks belonging to the Fort Wayne Corporations to be loaded improperly and then stopped the drivers from beginning their deliveries due to the defects Mr. Jordan allowed. This was apparently done in an attempt to frustrate the drivers and expedite the failure of the Fort Wayne Corporations. The intent was clear as similar or more egregious defects in trucks belonging to other independent service providers would go uncited while even minor defects in the Fort Wayne Corporations' trucks would be cause for delay.

62. FEDEX, through its employees, intentionally scanned undelivered packages at the end of the day from other independent service providers, and falsified package information, by

9

assigning them to the routes belonging to the Fort Wayne Corporations. This resulted in the appearance that the Fort Wayne Corporations were failing to deliver its packages. When these actions were brought to FEDEX's attention, it attributed the matter to simple error, but never rectified the situation.

**FEDEX Interference with Staff of the Kokomo Corporations**

63. On or about June of 2019, the Kokomo Corporations were forced to transitioned to the new ISP that had plagued the Fort Wayne Corporations and FEDEX even required that FXKOK01 and FXKOK02 merge into one corporation.

64. As a result, in mid to late 2019 the Kokomo Corporations began to experience the same problems as the Fort Wayne Corporations with revenue shortages.

65. Then, as the 2019 holiday peak season neared, the Kokomo Corporations began to experience the same aggressive tactics used by FEDEX, seemingly calculated to ensure the failure of peak season for the Fort Wayne Corporations.

66. New driver screening was taking unusually long, trucks were being delayed for minor issues while other independent service providers were excused significant defects; and FEDEX's Senior Manager at the Kokomo location, Jay Koontz, began to approach the employees of the Kokomo Corporations, disclosing sensitive business information to them and encouraging them to quit—the same tactic used by FEDEX in Fort Wayne.

67. As a result of FEDEX's interference, the Kokomo Corporations failed during peak season and were issued an OTC.

**Florida**

68. Despite the troubles, JOLLOFF continued their attempt to expand, as they had successfully run multiple independent service provider corporations for nearly six years.

10

69. In August 2019, JOLLOFF acquired an interest in TZ INTERNATIONAL, which serviced approximately 12 to 19 routes in Fort Myers Florida.

70. Just after holiday peak season started, the FEDEX Manager at the Fort Myers location, Raymond Reid, took three of TZ INTERNATIONAL's routes, without a legitimate basis.

71. Mr. Reid alleged that he took these routes believing that they would fail.

72. He later issued an OTC in December of 2019, for all routes, for the failure to service the three routes that TZ INTERNATIONAL, was not even allowed to service.

73. Importantly, TZ INTERNATIONAL, did not fail during the holiday peak season. Its delivery rate across all routes that it was permitted to service was 99.8%.

74. Because of this egregious action of Mr. Reid, FEDEX sent an investigator to Fort Myers but, as to Plaintiffs knowledge, nothing ever came of the investigation and Plaintiffs were not allowed to review the investigator's report.

**Termination of Contracts**

75. Despite the lack of any provision in the ISP specifically granting an independent service provider the opportunity to sell its routes upon FEDEX's termination of the ISP, this had been the prior practice with all independent service providers, and what Plaintiffs expected when contracting with FEDEX.

76. Normally, when FEDEX terminates an ISP, the independent service provider is given anywhere between thirty to sixty days to attempt to sell the routes.

77. These are valuable and lucrative routes that individuals and companies pay hundreds of thousands of dollars to acquire. FEDEX is aware of this and has created and encouraged this marketplace.

78. However, Plaintiffs were not given the opportunity to sell any of their routes.

79. In Fort Wayne, FEDEX terminated all the contracts for all five corporations within one year as follows:

   a. FXFWY01's contract was terminated in February 2019.

   b. FXFYW03's contract was terminated in April 2019.

   c. FXFWY04's contract was terminated in July 2019.

   d. SCHULTISE ENTERPRISES's contract was terminated in October 2019.

   e. JP GANCZAK ENTERPRISES's contract was terminated in February 2020.

80. FEDEX also terminated all of the Kokomo contracts as follows:

   a. FXKOK01's contract was terminated in February 2020.

   b. FXKOK02's contract was terminated in February 2020.

   c. CENTRAL ACQUISITION's contract was terminated in March 2020.

   d. MRK DELIVERIES' contract was terminated in September 2019.

81. In Florida, TZ INTERNATIONAL's contract was terminated in February 2020.

82. In every single instance, JOLLOFF—on behalf of the various corporations—submitted two to three qualified candidates to purchase the routes.

83. The candidates presented by JOLLOFF were qualified and had prior experience delivering FEDEX packages and servicing FEDEX routes.

84. Despite JOLLOFF's presentation of qualified and willing purchasers, FEDEX arbitrarily and capriciously refused to approve any of the buyers.

85. Yet, in some instances, the very same buyer FEDEX refused was the same person/entity to which FEDEX later gave the routes.

## COUNT I
## BREACH OF CONTRACT

86. Plaintiffs re-allege and incorporate by reference paragraphs 1-85 above as though fully set forth herein.

87. Plaintiffs have performed all acts required under the ISP Agreements.

88. FEDEX breached the Agreements when it:

   a. interfered with Plaintiffs' businesses by causing the failures that led to the OTCs;

   b. issued the OTCs knowing that FEDEX had caused the failures;

   c. delayed the hiring process for new drivers during peak season;

   d. harassed Plaintiffs' employees and encouraged them to quit;

   e. treated Plaintiffs' drivers disparagingly while ignore deficiencies of other drivers employed by other independent service providers;

   f. falsifying Plaintiffs' package delivery metrics

   g. arbitrarily and capriciously denied qualified buyers for Plaintiffs' routes;

   h. terminated Plaintiffs' CSAs without providing a real opportunity to sell;

   i. took Plaintiffs' CSAs and delivered them to other independent service providers without compensating Plaintiffs.

89. FEDEX actions constitute material breaches of the ISP agreements, which were valid contracts between the Plaintiffs and FEDEX.

90. As a direct result of FEDEX's breach, Plaintiffs have been damaged, and continue to suffer damages.

WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

## COUNT II
### BREACH OF GOOD FAITH AND FAIR DEALINGS

91. Plaintiffs re-allege and incorporate by reference paragraphs 1-85 above as though fully set forth herein.

92. Plaintiffs entered into numerous ISP Agreements with FEDEX. In performance of these contracts, Plaintiffs completed all, or substantially all, of the significant requirements that the contract required up until FEDEX's interference.

93. FEDEX, through its conscious, deliberate, and/or negligent acts—not approving drivers in a timely fashion, encouraging Plaintiffs' employees to quit, facilitating and creating errors in Plaintiffs' truck loading process, and falsifying Plaintiffs' package delivery metrics—caused Plaintiffs to fail to meet the ISP's requirements.

94. By and through its acts, FEDEX frustrated the Parties' performance of the various contracts, and did not meet Plaintiffs' expectations under the Agreements.

95. Furthermore, FEDEX, through its conscious and deliberate actions, arbitrarily and capriciously denied all of Plaintiff's proposed buyers and did not even consider them.

96. As a direct result of FEDEX's actions, Plaintiffs were deprived of the benefits of their respective contracts and suffered damages.

WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

## COUNT III
### TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS

97. Plaintiffs JOLLOFF, the Fort Wayne Corporations, and the Kokomo Corporations, re-allege and incorporate by reference paragraphs 1-67 above as though fully set forth herein.

98. Plaintiffs had business relationships with numerous managers and drivers in the Fort Wayne and Kokomo locations.

99. FEDEX was aware of these important business relationships.

100. FEDEX intentionally and unjustifiably interfered with these relationships by encouraging Plaintiffs' employees to quit or take positions with independent service providers.

101. By engaging in the wrongful conduct, FEDEX intended to disrupt the relationship between Plaintiffs and their employees and knew that the disruption of the relation was certain to occur.

102. FEDEX deliberately harmed Plaintiffs by engaging in the aforementioned wrongful conduct.

103. As a direct and proximate cause of FEDEX's behavior, Plaintiffs suffered damages to their relationships with their employees, and suffered and continues to suffer monetary damages.

WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

## COUNT IV
## TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS

104. Plaintiffs JOLLOFF and TZ INTERNATIONAL, INC., re-allege and incorporate by reference paragraphs 1-15 and 68 through 85 above as though fully set forth herein.

105. Plaintiffs had business relationships with numerous managers and drivers in the Fort Myers location.

106. FEDEX was aware of these important business relationships.

107. FEDEX intentionally and unjustifiably interfered with these relationships by encouraging Plaintiffs' employees to quit or take positions with independent service providers.

108. By engaging in the wrongful conduct, FEDEX intended to disrupt the relationship between Plaintiffs and their employees and knew that the disruption of the relation was certain to occur.

109. FEDEX deliberately harmed Plaintiffs by engaging in the aforementioned wrongful conduct.

110. As a direct and proximate cause of FEDEX's behavior, Plaintiffs suffered damages to their relationships with their employees, and suffered and continues to suffer monetary damages.

WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

## COUNT V
## FRAUDULENT INDUCEMENT TO CONTRACT

111. Plaintiffs re-allege and incorporate by reference paragraphs 1-85 above as though fully set forth herein.

112. FEDEX, in inducing Plaintiffs to become independent service providers, led Plaintiffs to believe, through FEDEX's statements and actions, that Plaintiffs were purchasing assets that could be sold upon termination of contracts.

113. FEDEX knew that its statements and actions, at the time they were made were false, because FEDEX presented Plaintiffs with contracts that did not specifically preserve the right to sell.

114. The statements and actions were made for the purpose of inducing Plaintiffs to act in reliance thereof an enter into numerous contracts with FEDEX.

115. In reliance of FEDEX's statements and actions, Plaintiffs entered into various contracts to provide package delivery services, as described herein.

116. Upon termination of the contracts, FEDEX gave Plaintiffs the false illusion that a sale of the CSAs would be allowed but, in reality, FEDEX never intended and never considered any of the buyers posed by Plaintiffs.

117. As a direct and proximate result of FEDEX's false statements and actions, Plaintiffs suffered monetary damages.

16

WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

## COUNT VI
## NEGLIGENT RETENTION AND SUPERVISION

118. Plaintiffs re-allege and incorporate by reference paragraphs 1-85 above as though fully set herein.

119. FEDEX hired and supervised Dan Jordan, Assistant Senior Manager in charge of the Fort Wayne location who eventually because the Senior Manager at said location.

120. FEDEX hired and supervised Mark Williams, one of FEDEX's five Vice Presidents.

121. FEDEX hired Carlos Etheredge, Regional Vice President overseeing Plaintiffs' businesses in Fort Wayne and Kokomo.

122. FEDEX hired Raymond Reid, Senior Manager overseeing the Fort Myers location.

123. Dan Jordan was unfit and incompetent to perform the work that he was hired to perform, as evidenced by the acts that he committed against independent service providers with the intention of disrupting and terminating their businesses.

124. Mark Williams was unfit and incompetent to perform the work that he was hired to perform, as evidenced by the acts that he committed against line servicers with the intention of disrupting and terminating their businesses.

125. Carlos Etheredge was unfit and incompetent to perform the work that he was hired to perform, as evidenced by the acts that he committed against line servicers with the intention of disrupting and terminating their businesses.

126. Raymond Reid was unfit and incompetent to perform the work that he was hired to perform, as evidenced by the acts that he committed against line servicers with the intention of disrupting and terminating their businesses.

127. FEDEX knew, or should have known, that Dan Jordan was unfit and incompetent in his employment and that this unfitness created a risk to others, because JOLLOFF and his managers complained to FEDEX about Mr. Jordan on numerous occasions through the FEDEX "RESOLVE" hotline, which was the only internal recourse available to independent service providers for dispute resolutions.

128. FEDEX knew, or should have known, that Carlos Etheredge was unfit and incompetent in his employment and that this unfitness created a risk to others, because Mr. Etheredge supervised Dan Jordan and was aware and involved in the scheme to disenfranchise Plaintiffs' of their CSAs.

129. FEDEX knew, or should have known, that Mark Williams was unfit and incompetent in his employment and that this unfitness created a risk to others, because Mark Williams supervised Carlos Etheredge and, upon information and belief, was the person at FEDEX set off the chain reaction leading to Plaintiffs' loss.

130. FEDEX knew, or should have known, that Raymond Reid was unfit and incompetent in his employment and that this unfitness created a risk to others, because FEDEX itself sent an investigator to Fort Myers to investigate Reid's actions after it took TZ INTERNATIONAL's routes without justification and later issued a fraudulent OTC.

131. This unfitness and incompetence harmed Plaintiffs because the wrongful actions conducted by these individuals led to the unfair and unjustified termination of the CSAs and to Plaintiffs' losses, as a result of being denied the ability to sell the CSAs.

132. FEDEX's negligent retention and supervision of Mr. Jordan, Mr. Williams, Mr. Etheredge and Mr. Reid was a substantial factor in causing Plaintiffs' harm.

WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against FEDEX as follows:

1. Compensatory damages;

2. General damages;

3. Pre-judgment interest;

4. Attorneys' fees and costs;

5. Such other and further relief as the Court deems necessary and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues triable as of right.


Respectfully submitted this _5th_ day of March, 2021.

By: _____
STEPHEN N. McGUIRE II, ESQ.
Florida Bar No. 102755
Costello, McGuire & Wicker, P.A.
Attorney for Plaintiff
PO Box 60205
Fort Myers, Florida 33906
Phone (239) 939-2222
Facsimile (239) 939-2280
Primary Email: smcguire@cmw.law
Secondary Email: pleadings@cmw.law